All right, we'll begin with Umana, United States v. Umana, and Mr. Bronco. We'll hear from you. Good morning, and may it please the Court. Vince Bronco on behalf of Mr. Umana. We have briefed many serious issues that question almost every aspect of this case, and while I'm prepared to discuss any issue that may interest the Court, I hope to start with those surrounding the Los Angeles shootings. The Supreme Court has agreed that uncharged murders is the most powerful, imaginable, aggravating evidence. The government's proof of these Los Angeles murders, however, was suspect. The bulk of the government's evidence consisted of, one, the confessions of Mr. Umana, and two, unconfronted, blame-shifting hearsay of statements made by those accused of the LA murders. Because Mr. Umana's confessions were essential to the government's proof and its argument for death, that is the issue I'll begin with. Before Mr. Umana confessed to the LA shootings, the detective told him, quote, it doesn't cost you anything to talk, and made other assurances that conveyed that, quote, he had nothing to lose by talking. And these assurances, particularly the doesn't cost you anything assurances, occurred even before Miranda. Just right before Miranda, Detective Flores explained, there are things that we have to resolve to get that weight off ourselves. Then he states, well, it doesn't cost you anything, right? He reads Miranda, and later on, before Mr. Umana says anything, there's two more it doesn't cost you anything assurances. In total, over this two and a half hour interrogation, there's at least six instances of it doesn't cost you anything. But only one came before, in your view, before he was Miranda-ed. Before Miranda, yes. But another important point, though, is there's no explicit Miranda waiver. After Miranda, Mr. Umana says, something to the extent that we'll see about that, and they begin talking, but he doesn't start actually admitting to any conduct regarding either of the LA shootings until pages and pages later, and after several more assurances, both that it won't cost you anything, and other assurances that go to the context that he had nothing to lose by talking about these. The testimony of the agents was there's also repeated instances of, that he said, it would not affect your case in North Carolina, and Agent Flores expressly stated, you don't have anything to lose. And again, that's before any admissions as to the details of either of the LA murders. Because the law enforcement officers contradicted the Miranda warnings, any subsequent statements must be suppressed. And cases from the 11th Circuit really show the way in this regard. These statements came before the jury in what form? Excuse me, Your Honor. They came in front of the jury both through the testimony of two of the interrogating agents, and the jury received an exhibit, a 200 and something, like 50-page exhibit of the entire interrogation. And the assurances that the government, or that the detectives... What phase of the trial did it come in? Sentencing phase. Selection? Yes. Selection phase. And this case is analogous to others in the 11th Circuit, particularly where in Hart v. Attorney General of Florida, where there, there is a case even of, there is Miranda rights given, and the person actually signed a waiver saying, I give up my rights, I agree to talk to you. But then later on, he started asking questions about the pros and cons of hiring a lawyer. And there, the agents told him, honesty wouldn't hurt him. And it was because once he, once the agents started saying comments like, honesty wouldn't hurt him, suggesting that there would be no, and their words are, suggest no detrimental consequences from discussed, from talking, that invalidates the Miranda warning. When you give a contradictory statement that anything after that is an unknowing, intelligent waiver, and even makes the statements involuntary. Beale and other cases where agents told him that it would not hurt him if he continued to talk. Again, this was a contradiction of the basic premise of Miranda, that anything you say won't be held against you, and it's analogous, it's pretty much the same as what happened here, of the agents telling him, it won't cost you anything, and you have nothing to lose by talking. And the statements here made a profound difference in the case. And that's in two ways. First, it made a difference as to whether or not the government could actually prove the non-statutory aggravating factor that Mr. Amania had committed uncharged murders. Olamontes actually says that a confession is the most damaging type of evidence, and that's what this was. There were statements as to both incidents giving details of both. The other part is how the government relied on these statements. Again, they presented evidence, not only the transcript of the interrogation, but had two different detectives from Los Angeles come in and explain what those sentences were, and in very damaging terms to Mr. Amania, conveying that it was a confession, that he was there, pulled out the guns, at least for one incident, and that he was actually the purpose and assisted the other. And these were relied on by the government during closing argument for the Fairfax incident, they said, and we know it was him. He even said it. I had a gun. I pulled it out, is what he told the detectives in the interview. I mean, he's proud of what he's done. Was there evidence that he was the only person who was common to both murders? In other words, there was evidence, wasn't there, that the shots fired at both murders were fired from the same weapon? There was independent evidence that only he was at the scene of both murders. The independent evidence of placing him at the scene of each was extremely weak. And even the district court made findings on this when he ruled on whether or not the other suspects' interrogations should come in at all. And he said that one of the facts that the district court was relying on is Mr. Amania's statements, placing him at each event. So that was critical to the district court's reliance. He also mentioned those facts when the district court did. Was there any evidence other than his own statement that placed him at both sight scenes? The only evidence as to the Lemon Grove incident was there, first of all, there were two witnesses to the Lemon Grove that specifically were shown a six-pack identification with Mr. Amania in it and could not recognize him. The other evidence was by Mr. Gonzalez, who was not shown a photograph until months after the event, and the district court called that identification a suspect, and he lacked confidence in it. And it wasn't actually a positive identification. So at least for that one, the evidence was weak. As to the Fairfax incident, the only other evidence placing Mr. Amania at the scene were the other suspects that were in the vehicle that were interrogated and shifted the blame from themselves over to Mr. Amania. And what's important to remember about the Fairfax incident is there were two neutral eyewitnesses there. You would agree that's not an unusual circumstance in multiple defendant cases. Well, actually, this isn't an unusual circumstance because, at least here, they weren't charged as defendants. Where someone does, it may be unusual or not usual to shift blame, but courts traditionally, the Supreme Court and others, say that when we need to treat those type of statements as inherently unreliable, that when someone shifts blame, that that allows you to attack their credibility. And the district court also made findings on that. You argued that to the jury, didn't you, that they were unreliable? Correct. But one of the difficulties of this case is the jury never got to see these other suspects, meaning all this was presented through the lens of the investigation. This is during the selection phase, right? Correct. This is a highly discretionary phase where anybody can basically throw in hearsay and he's already been qualified for the death sentence. And so the question now is up to the jury to make a selection between life or death. And you would agree, wouldn't you, that the rules of evidence during this particular phase is much more relaxed? The rules of evidence, but as we've presented in other arguments, we argue that because of the particular circumstances of this case, the confrontation should apply to these witnesses. But besides our separate confrontation clause or just a combination of factors that we should have gotten to confront those other witnesses, why I'm bringing up here is to, when you look at, because assuming that these statements shouldn't come in, looking at the evidence as to what was the government's evidence, strong or weak, we don't, the jurors or this court, these witnesses have never been subject to one of the greatest engines for truth ever, and that's the confrontation clause. And that makes what the evidence, the jury... Has the Supreme Court ever suggested that Crawford should be applied in this context? The Supreme Court hasn't taken that case yet. They have Williams a long ago, which wasn't even a confrontation clause case, but considering the developments of what has happened, meaning the developments of the Sixth Amendment, developments during the Eighth Amendment calling for increased reliability at sentencing, the developments regarding Apprendi, that this is, that at least in these circumstances is this case. But getting back to whether or not the suspect's at trial, and because these witnesses, because we, the only thing that the jury heard were out of court statements from their interrogation, and through the lens of the interrogating officers, and then when you take their statements, and at least for the fair facts, you have three people that were in the car saying it was Mr. Amani that did it, after repeatedly denying that they were even involved. And then you have two neutral eyewitnesses to that event, that when they witnessed the scene, said the driver of that vehicle got out, and he was the shooter. They also drew a diagram that was introduced at evidence, showing that it was the driver that got out. The driver is one of these other suspects that is now trying to blame Mr. Amani. So, you know, there is reason to doubt the government's proof on this, especially when you take out Mr. Amani's statements. And as far as was this aggravator important to the government's case, it was. Again, assuming that it was air to introduce the statements. The last thing is that the court would look at is, you know, is it possible that the, that a juror would not, or would have, can the government prove beyond a reasonable doubt that this evidence would not have influenced at least one juror? And it's not, because the government based their case on that Mr. Amani had killed before. This theme infected pretty much every, was throughout the initial closing argument and through the rebuttal. And they also tied that, that theme through all the other aggravating factors, meaning there are times, you know, they claim that because he had killed before, it made him more potential to be a future danger. There are more than just one gang motivated killers. So this really affected the government's entire case. And so the government can't meet its burden to prove beyond a reasonable doubt that the air complained of did not contribute to the verdict. Unless there are questions, I will save my time for rebuttal. All right. Thank you, Mr. Ronco. Mr. Morris. Good morning. May it please the court. The defendant in this case received a fair trial and the government asked that the court affirm his convictions and sentence in all respects. I'd like to begin where my colleague left off, which is with regard to the Fifth Amendment statements that were introduced against the defendant. And I'd like to begin by pointing out to the court something that the defendant I don't think is able to overcome, which is that the main reason that the witnesses who were in the car with him that day in Los Angeles in the Fairfax Street murders, two of them who gave testimony or cooperated with the Los Angeles police, when the defendant learned that they were in jail and were cooperating with police and had implicated him, he had them assaulted in jail. And while I didn't expressly bring up the standard in Rule 804 about forfeiture by wrongdoing, there is at least some equitable principle that's got to apply where a capital defendant who has witnesses against him assaulted in jail, and the trial evidence is clear on that, comes in and complains that the witnesses did not testify at trial. The government doesn't think that that's a standard that ought to apply. Well, are you arguing that that circumstance about the jail assaults makes their evidence more reliable? Yes, Your Honor. Yes, I think that that shows that the defendant had, obviously, even if they were lying, the defendant could have had a motive to intimidate them. But you would think, I do think that that shows more likely than not that the statements were reliable. I think it shows that he was going to do anything to prevent them from coming into court and testifying against him. But more aside from the factual matter of their reliability, it does go to the procedural point, which is when you orchestrate a campaign against witnesses, you can't complain that they were not present, whatever they were going to say. That's not, I think, a fair reading of the record. Did the government argue to the court that they weren't present because you couldn't provide protection to them? That's what you seem to suggest. Did you tell the court or was it representing the court that you couldn't provide protection to them and that's why they weren't present? You didn't do that, did you? No, Your Honor. You're suggesting that that's the kind of waiver. Somehow you're arguing that you can't say they're not here because you created the circumstances that made their presence unavailable. That wasn't the case in this case, was it? If I understand Your Honor's question correctly, the government did not seek, and frankly I don't believe we had any reason to seek, to provide them special protection. They were incarcerated, he was incarcerated, and the defendant orchestrated through his jail writings and gang networks. What was the question? The question is whether they were willing to testify after being assaulted? Correct. So it's a question of whether they would agree to be witnesses, not a security question. Correct. Did they agree to be witnesses? The government planned on calling them and the government learned that they would not testify and we didn't push the point any further in light of their reason for that was their reasonable fear for their lives, which incidentally was part of the conversation, as the district court found, when two of them were in the jail cell in California when the whole event happened in the first instance. So the court's questions regarding the evidence placing him at both scenes, I'd like to turn to that. Judge Niemeyer, you're correct. There was evidence in addition to his statement, there were other individuals in the car. The district court found that one of those statements had been made to police earlier in the proceeding and then there were the two statements by the co-conspirators who were put in the jail cell together. But all three said the same thing. One of those statements, one of those witnesses testified at a preliminary hearing and was cross-examined about his testimony, obviously not by a defendant or his counsel. But these statements, the government believes, bear sufficient indicia of reliability, especially in light, Judge Niemeyer, as you pointed out, the entire goal of the Federal Death Penalty Act is to enable the sentencing jury, once the standards, once the elements, once the statutory aggravators and the gateway intent factors and the crime of conviction have been proved beyond a reasonable doubt, to provide the jury the maximal amount of information regarding the defendant and his life and his character. What was the evidence other than the defendant's statements that placed him at the other murder? It was the identifications of Freddy Gonzalez, Your Honor, and there were two six-packs in which he identified the defendant. He disclaimed being 100% sure. The government does not quibble with that. The district court's finding that he lacked confidence in the identification was actually made when the government tried to introduce his in-person, in-court identification, and the district court said he lacked confidence in that and found it unduly suggestive. But those two identifications at least carry some weight, and they're certainly consistent with the other evidence in the, with respect to the Los Angeles murders. And of course, as Judge Niemeyer correctly pointed out, the, the ballistics evidence was such that the same gun was used at both scenes as well. I'd like to turn to the, to the statements, or the argument, rather, by the defendant that the, that the statements by the officers made to him in his interrogation were sufficient to overbear his will. And I think it's important to remember that that is the standard that is to be applied. While it's true that these statements had some tendency to contradict the Miranda warnings, the cases that the defendant has identified do not create a per se rule regarding that issue. And all, the government would suggest that all ploys, all ruses, all misrepresentations fall somewhere on the spectrum of undermining the Miranda warnings. What is important for the court to look at in this case is the totality of the interview, which indicates that the defendant at all stages was, was well aware of what was going on, was not convinced at all by the representations of the officers, was calm, and his, his will simply was not overborne. He didn't have a reason to be calm because he was told that it wouldn't hurt him. He was told that, Your Honor. Yeah, that's why he's calm. He was calm, Your Honor, because he was playing a game with the officer, the same game that they were trying to play with him, I would suggest. You're playing a psychologist now. I'm talking about the facts. The facts that they told him, look, that honesty will not help you, this is not going to hurt you in your case. That's what they told him. You're playing a psychologist now. I'm talking about the facts of the case. Your Honor, we don't know what he was in his mind. He was told, but you're using the word he was calm to suggest that he was in control, but calm also is consistent with being assured that what you said would not hurt you. Does it, is it not? It is, Your Honor. But looking at the defendant's words as he repeatedly engaged with the officers throughout the entire course of the interview, it's apparent that he did, that he did not believe, he did not believe their assurances. He did not respond and admit things on the basis of their insurances. He didn't say, oh, okay, it doesn't cost me anything, well, then I committed the murder. He engaged in a verbal fencing match with the officers that lasted from the start of the interview until the end of the interview. And the cases that the defendant has cited indicate that the issue is not per se contradiction, but what is the causal connection, the proximate cause, whether the statements of the officers were the proximate cause, one of the cases says, of what the defendant said. And I would suggest that if you look at the transcript in its entirety, the defendant here engaged in a, made a calculation early on that he was going to try to toy with the officers a little bit, that he was going to talk to them and then, and then not give them what they ultimately wanted. And that's what happened throughout the whole interview. The officers never- I agree what they told him was in direct contradiction to the very heart of Miranda Warner. That is that statements that you make may be used against you. What they told him directly contradict the core of the warning. Do you agree with that? I would agree that they indirectly contradict the core of the warning. Indirectly? How can it be more direct when they said what you say won't hurt you? Well- What's more direct than that? Well, some of the, the one case that the defendant has identified that's more direct is, I'm not going to prosecute you. Even in that case, though, the court engaged in an analysis indicating, or looking to whether that particular promise, it was what induced the defendant to say what he, what he said. Well, there's always the proposition, isn't there, that when you're talking with the police, and the police often say this, that if you come clean and cooperate, basically, it could help you. The fact finder in the court could find that your cooperation would mitigate the severity of a sentence. And so, it's not totally off the charts to say you can help yourself by cooperating. That's correct, Your Honor. And that- What about the facts of this case, though? Well, I do, I think the facts of this case, it shows it did fall along that spectrum. They were- The facts of the case didn't say what you say might mitigate or might be used to reduce your sentence. It said it will not harm you. It will have no impact. I can't imagine how universally that is in terms of the shield of protection. I can't understand the government's position here, knowing the very checkered past that this country has in death cases, that you would want to present cases, evidence like this before the jury when we know the history of this country in terms of the death penalty and how random sometimes it is, and how pointed it is. For example, in this case, the argument's like, he's here because of who he is. You know, that's pretty- and then they say he's a killer. Killer is what you are, maybe, but it's not who you are. But they said directly, you're here because of who he is, and suggested about coming to this country and committing crimes, and we don't allow that, we take care of that. Those are the kind of codes and types of words that have caused incredible disparate dispensing of the death penalty in this country. So I'm wondering why the government's position is taking this kind of evidence and these kind of random warnings, and can you just comment on that in terms of the position of the government there in terms of this case? Your Honor, I think that the police work in this case, as Judge Niemeyer just pointed out, I think the police work in this case was on the spectrum of what often happens in police interrogations, which is- and Judge Posner makes this point in the Rutledge decision that the defendant relies on, that when they're told, you can help yourself, you're going to help yourself, that is almost never true. It's misleading. When police tell- Why do you say that? They can help themselves, can't they? Well, it can in theory, I mean they can get credit for cooperation, but usually what happens, and what happens in the cases where the courts have discussed this, is that it has in fact not helped the defendant. And what I'd like- Well, that may be because of other circumstances and the positions that the defendant may take later, but it seems to me one of the hallmarks of the sentencing guidelines is to credit that kind of conduct and give a benefit to defendants who are willing to come forth and face their conduct in a truthful manner. And the sentencing guidelines do give benefits to that, and as do judges and juries. I certainly can't and won't quibble with the proposition that that occurs sometimes. The suggestion that this whole thing is a ploy for racism is really a peculiar suggestion in view of the fact that we have evidence in this case that this man walked in a restaurant in the presence of everybody present and assassinated people face to face. Two people just shot him dead. And with witnesses all around as part of this MS-13 gang, I don't think we're talking about an unfairness in race or a spotty application of the capital, potential capital sentencing. That's determined by the jury in view of all the circumstances. And of course the government agrees. While Judge Gregory, you're correct that there have been plenty of issues and they're well raised, those issues, I don't believe, in the way that Your Honor is suggesting. And that... Why not? Why not? Because... Because... Because you suggest that the person they killed was because of the victim's race? I don't believe... As a matter of fact, race, Judge Nehemiah brought up the word racism. I think... I didn't. No, I understand. I said disparate. There may be a disparity in terms of poor people, people who have mental illnesses. You know, there's a diverse history. So to cabinet and to race, I didn't. Judge Nehemiah did. So don't put that word in my mouth. But since he went there, we can go there if you want. So we're talking about race because of their race? Because the people he killed were... Were what? Your Honor, I wasn't intending to... Well, you said... You reacted to Judge Nehemiah bringing up race and you said no implication of race. Why is that? Because of what? No, what I meant to say, Your Honor, I apologize if I was unclear. What I meant to say was that I don't think that this case implicates any of the, you know, admittedly grave concerns that courts have struggled with over the last 50 years with regards to capital punishment. The in-person identifications, for example, of the defendant as the shooter on the crimes of conviction in broad daylight are unchallenged. There's no metaphysical question about his factual guilt. The evidence of his... In fact, that's the problem with this case. Obviously, in cases like this, they're always horrible. Someone always dies. You don't get the death penalty. You're not qualified unless someone dies. We know it's death involved. But the circumstances was there was an altercation, was it not? There was an altercation. And the altercation, under the evidence, is that the persons who they were fighting may also have been in a gang, right? No, Your Honor. That's incorrect. Not at all? No. They were contractors. A group of the two brothers. One of the brothers owned a contracting company and they were day laborers thereafter their Friday night. So it was just a fight that just occurred. It was just a fight. And admittedly, the victims were inebriated and they did stand up and they did say, we don't care about your gang. I know it's some reference to gang. From the victims first. Well, that's because the defendant and his cohorts walked over to their table and got in their face and did their hand gang signs. Right. And that's the point. I'm not justifying any of this, but that's the context of the murder, right? And that's what they were tried for, right? Correct. Altercation. Horrible. Someone was killed. But then it seems like when it comes to sentencing, the selection, as you say, another case was tried. And that was to make them killers as to who they were. See, it seemed to me you ought to be tried. I know Judge Nehemiah was suggesting he's right that there's relaxed in terms of cross-examination, those kind of things. But we're not talking about the difference in whether or not a person had five merit versus a B. We're talking about uncharged murder as being the basis for whether or not a person should die. And that's why it makes this case somewhat troubling because Miranda writes directly contradicted, the witnesses don't come forward as all things in the transcript that the court ruled out were in, and I guess you're going to argue that we don't know whether the jury looked at them or not, but you'd agree that they shouldn't have been in that transcript in there. But those kind of things, and that's what the Supreme Court tells us, death is different. It's different. Your Honor. That's my concern. I certainly understand those concerns, but with respect, I disagree on the view of the trial. That's fine, that's fine. The Supreme Court also has indicated, and this court has said it numerous times in capital cases, that defendants are entitled to fair trials, not perfect trials. And what the government is suggesting here is that this trial was quite fair. The district court bent over backwards, for example, when the defendant engaged in his in-court intimidation of the witness. The trial, the sentencing phase, whether a person is defined by his acts is a philosophical question. But this case was about the defendant as a whole, and what the evidence showed was that his entire adult life had been devoted to committing mayhem in the name of this gang. And that mayhem did not stop when he fled Los Angeles to New York, which, by the way, is additional evidence that he was guilty of the Los Angeles murders. He was the only one of the Los Angeles crew that left town. So it did not stop when he went to New York. It did not stop when he traveled down the Eastern Seaboard. It did not stop when he entered that restaurant in Greensboro that night. And his cohorts, although they engaged in a confrontation, left the restaurant. He was the one who stayed in the restaurant, could not be pulled out of the restaurant. And then it continued after arrest with this campaign against the Los Angeles witnesses, with his campaign against the witnesses. He did it also after the two contracting brothers tried to make peace and sent him a bucket of beer, free, as a peace offering. And apparently he rejected that entirely, too. That's undoubtedly correct, Your Honor. And I also want to highlight that the intimidation and conspiracy that the defendant engaged in in jail, I think it fairly can be said that it intensified. And on the first day of trial, arguably the most compelling evidence in the entire case is when the defendant tries to sneak a knife strapped to his penis into the courthouse on the first day of trial. And the district judge specifically commented about the looks on the jurors' faces when that happened. This is a defendant, the story of the defendant's life cannot be told without telling the story of MS-13. And the defense certainly put on a mitigation case that tried to tell a story of the defendant's life that was an alternative. That wasn't a story that the sentencing jury credited in most respects, although they did find the mitigating factors of indoctrination into MS-13 and some others. But this sentencing hearing was exactly what the Federal Death Penalty Act envisions, which is maximal information about the defendant and his character and his conduct. And although the arguments about reliability and the arguments about all of the arguments that the defendants made in his brief and today before this court were in fact raised to the jury, as Judge Agee pointed out, all of the reliability concerns, the jury filtered that information. The jury found beyond a reasonable doubt properly instructed that he had committed these offenses. And what Runyon says is that under the Federal Death Penalty Act, that is the exclusive province of the jury as long as they're properly instructed. So the government believes that this sentencing proceeded almost precisely as the act envisioned. And that the issues raised by the defendant, while not insubstantial, simply don't warrant a reversal of the sentence or the convictions where the evidence of his conduct was so overwhelmingly in favor of the sentence. Right. Exactly. And you made a great jury argument, I'm sure, at the trial. That's what happened. And the jury was convinced of that. But the problem becomes, all this you talked about, the police officers, the officers put this on. You didn't have any witnesses, did you? Well, we would have had witnesses had the defendant not had them beaten up and jailed. Well, that's what you said. I think that's... Who said that? The defendant had them beat up. Who said that they had them beat up? The defendant had them beat up. His jail correspondence was orders to beat up the witnesses. And then others wrote back to him, we have beat up the witness. We sang him the tune, I think was one of the letters. But it was coded. But they were assaulted in jail on his orders. And his lieutenants then responded that the deed is done. And that evidence was before the jury. Right. So you're right. You can burlesque all that before the jury without any confrontation at all. Your Honor, the confrontation issue is, I think, settled by the Supreme Court precedent. Although my colleague is correct that it was a due process case. A footnote, I believe, in Williams indicates that that was just because the Bill of Rights hadn't been incorporated against the states at that time. And so that case is good law. Three circuits have so found. And the simple fact is, under the Sixth Amendment jurisprudence, there are only two categories of information. And Ring v. Arizona says this, and as does Elaine, for that matter. That there are elements, or things that function like elements, and in the federal death penalty case, that would be the statutory aggravators and the gateway intent factors, as well as the offense of conviction. And then there are non-elements. And non-elements are what was considered at the sentencing phase, the weighing phase, in this case. And I think that's the answer your learned colleague said when he answered Judge Nehemiah's question about what the Supreme Court is doing. The trend, certainly, is toward more protection in that regard. And it raises an interesting question, because this case pushes it to the limit. Those non-element factors now being uncharged murder, because basically, this case stands in the sense that you come up and have somebody in jail say, yeah, I saw him pop somebody in California. What's the difference? And then somebody died, and you put that on. It would be no restraints. Like I say, anything goes. There's no confrontation. There's no more reliability here than there, really. Well, I disagree a little bit with that, Your Honor. I think that I recognize that it is potentially a serious legal issue. But what I would say is that doctrinally, it's settled.  Mr. Boies, can I get your answer, though, please? Go ahead. Can you answer my question? Well, I just said, Your Honor, that doctrinally, I think the answer is that it's settled. And the Supreme Court's decisions expand. Elaine is the case that they rely so closely on. But Elaine, in the government's view, simply corrected sort of an outlier that the bottom end of the maximum for 924C purposes wasn't part of the sentencing range. And so Elaine doesn't say anything about what happens between 7 and life under 924C for brandishing. And the Supreme Court, in addition, I would suggest that the Supreme Court is not wholly expanding the Confrontation Clause jurisprudence. In fact, in several cases, it has been pared back. While those are not sort of eyewitness testimony cases, they're expert cases, the Williams v. Illinois, the DNA case. The Supreme Court has not continued in one direction on that path, is my only other point. Judge Niemeyer. Judge Niemeyer has a question. Go ahead. That's fine. Unless the Court has any questions about any of the other issues. Thank you, Mr. Morris. Okay, Mr. Branca. I'd like to begin the rebuttal by discussing some of the government's proof of the L.A. murders again. For the Fairfax incident, I want to bring to the Court's attention some of the District of Fairfax testimony. Specifically, the judge made comments that they're self-serving, there are inconsistencies, and that they're vulnerable to credibility attacks. A quote from the Joint Appendix at 3,678 through 79 is where these are coming from. He characterized their testimony as somewhat self-serving in that each attempted to minimize his own involvement in the shooting. He noted several inconsistencies during this time of inconsistencies between those three suspects and then concluded on 3,680 that, admittedly, Rivera, Ramos, and Arevalo were vulnerable to credibility attacks stemming from their desire to minimize their own involvement in the Fairfax Street murders. And the jury got away all that, which is their job. But the point I'm trying to make with this is if these statements were inadmissible, then showing how the District Court characterized these other suspects, particularly how it the admission of the statements were harmless beyond a reasonable doubt because the evidence was so weak. The government was interested in bringing those witnesses to court, have the jury hear them. And the witnesses refused to come because they've been beaten up. Actually, I disagree with that, Your Honor. Do you? Yes. Because that's nowhere in the record. The government's motion to admit this testimony never alleges at any point that there is any allegation that it doesn't want to present these witnesses because of any intimidation threats. The way they presented the motion in District Court and the way they argued it wasn't that we need to present the evidence through the agents and through the testimony. It's just that we want to. The government had at least one opportunity to get into what actual threats were made because it wanted to put in evidence that Arevalo was scared to testify. And the District Court had an out-of-the-jury hearing where the agent testified as to his conduct. And the most the judge got out was he was scared of Wizzard. It didn't indicate that he had received any threats. Arevalo was never beaten up. Not threats. I thought the two of them were beaten up, weren't they? That is incorrect. There is no evidence that Arevalo, the driver, the one that the neutral eyewitnesses... Were two of them beat up? No. Who was beat up? There's a suggestion in a letter from someone else to Mr. Umania that Chief Ramos had been beaten up. But there's nothing that Rivera, one of the other suspects, that he had even received threats. There's no indication that Arevalo had ever been beaten up. So for the government now to take this position that, oh, we didn't present this because they were threatened, is totally contradictory to the position at District Court where they never made these allegations and didn't allow the District Court to make a finding which is required for the forfeiture. Right. That's why I asked the question. I was surprised that the government took that position in an oral argument because it's not in the record like that. Go ahead. Exactly. And now I'd like to move to the Lemon Grove incident. And the only evidence there that Mr. Umania was there, other than his statements, is the so-called identification by Mr. Gonzalez. And this is what he actually wrote on his first line-up card. It says, photo number two looks like or resembles the guy who came to the park the day they I remember seeing this guy, but I'm not sure if he's the one that came to the park that day with the pistol and shot us. That is the identification that they're trying to rely on. Of course, two and a half years later, he makes another one, but still says, I'm not 100% confident. But again, the District Court made findings as to this identification. It says, the accuracy of the prior description of the criminal, I think, is suspect. He did have two six-pack show-ups. Neither one was positive of the photo that Bennett was the shooter. He gave less than certain responses to say it. And then the District Court concluded, the court does not have confidence in the pretrial identification and does not believe that five years later that he has even a less ability to identify the shooter. Another point, the court has mentioned the ballistics match, that the same gun was used in each proceeding. The government even alleges in the indictment and through its own expert and one of its informants that guns are commonly shared within MS-13. So just because the same gun was used does not necessarily mean that Mr. Amanio was the shooter. Was there evidence that Mr. Umanya did not share his gun? There's no evidence that Mr. Umanya ever had a gun. In that instance, it's just the same one. When he shot the two victims. You mean in North Carolina? That's what he's on trial for. Correct. Even in that case, there was evidence that that gun was shared, meaning that someone else originally presented that, like when that gun was brought out, that another member of the gang, Stiler, was the one who originally and mostly possessed it at a meeting of MS-13 members. Again, evidence that that gun was shared also. The next point I'd like to make is, that was the ballistics, and I have one more. Getting back to how much the government relied on Mr. Umanya's statements in its closing argument, as to the Fairfax incident, they said, and we know it's him, he even said it, I had the gun, I pulled it out is what he told the detectives in the interview. I mean, he's proud of what he's done. As to the Lemon Grove incident, they said, we need to go out, we need to take care of that park, and we need to take care of the people in that park. And that's exactly what he did, and that's exactly even what he said he did in his statement. We're going out there, and we're going to take care, because, you know, we had a little beef. And then in the rebuttal argument, they again get back to the statements and say, yeah, I was there, pulled it out of my pants, I don't know, I shot it, read it. So they extensively relied on it. And the government briefly mentioned the Runyon case, but that wasn't deciding the constitutional question we have here, and that is that the government has the burden to prove, beyond a reasonable doubt, that the evidence of Mr. Amanya's statements did not contribute to the verdict, and they simply cannot do that here. Unless the court has questions. Thank you, Mr. Bronco. We will come down and greet counsel, and then proceed on to the next item.
judges: Paul V. Niemeyer, Roger L. Gregory, G. Steven Agee